**Neil STAEBLER et al., Plaintiffs,**

v.

**Jimmy CARTER et al., Defendants.**

**Civ. A. No. CA 78–2028.**

United States District Court,
District of Columbia,
Civil Division.

Jan. 8, 1979.

Kenneth J. Guido, Jr., Washington, D. C., for plaintiffs.

Neil H. Kaslowe, Civ. Div., U. S. Dept. of Justice, Washington, D. C., for defendants.

## OPINION

HAROLD H. GREENE, District Judge.

This case involves the question of the power of the President to make a recess appointment of a member of an independent regulatory commission to replace a commissioner whose statutory term has expired and who claims entitlement to hold over pending the qualification of his successor by Senate confirmation. The matter is one of first impression in the federal courts.

### I

The Federal Election Commission is charged with implementing and administering the Federal Election Campaign Act, 2 U.S.C. § 431 et seq.[1] It is composed of the Secretary of the Senate and the Clerk of the House of Representatives, *ex officio*

1. The Act establishes a comprehensive scheme for the regulation of financing in federal elections, including the disclosure of political campaign contributions, registration of political committees, reports by such committees, candidates, and others, the making or receiving of financial contributions, and limitations on contributions. P.L. 92–225, Feb. 7, 1972, 86 Stat. 11, as amended by P.L. 93–443, Oct. 15, 1974, 88 Stat. 1272.

and without the right to vote, and six members appointed by the President subject to Senate confirmation for six-year terms. As originally established by the Federal Election Campaign Act of 1971, as amended in 1974 (P.L. 93–443, § 310, 88 Stat. 1263, 1280), the members of the Commission, other than the *ex officio* members, were appointed as follows: two members by the President, two members by the President *pro tempore* of the Senate upon recommendation of the Senate majority and minority leaders, and two members by the Speaker of the House of Representatives, again upon recommendation of the respective majority and minority leaders. Each of the members was to be confirmed by a majority of both Houses of Congress. This scheme was held unconstitutional by the Supreme Court in *Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976). Thereafter, the statute was amended to provide for the present method of appointment. P.L. 94–283, § 101(a), May 11, 1976, 90 Stat. 475, 476.

Plaintiff Neil Staebler [2] was nominated by President Ford on May 17, 1976, to be a member of the Commission for a term expiring on April 30, 1977.[3] Upon his confirmation by the Senate, he was sworn in, on May 21, 1976, as a member of the Commission. After his term expired, Staebler continued to serve on the Commission in accordance with the holdover provision (2 U.S.C. § 437c(a)(2)(B)) discussed in detail below. On September 27, 1977, President Carter, who is a defendant herein,[4] nominated John McGarry to fill Staebler's seat and to serve for a term expiring April 30, 1983. The nomination was referred to the Senate Committee on Rules and Administration, and hearings on McGarry's nomination were held in November and December of 1977. The Senate adjourned on December 15, 1977, and the nomination lapsed without confirmation.

After the Senate reconvened for its next session, the President, on April 10, 1978, again nominated McGarry to the same position. Questions were thereafter submitted by the Committee on Rules and Administration to McGarry and to the Counsel to the President concerning McGarry's personal finances, answers were provided, and hearings on the nomination were held in July and August, 1978. On September 13, 1978, the Committee by a vote of 7–2 favorably reported the nomination to the full Senate (see Exec. Rept. No. 28, 95th Cong., 2d Sess. (1978)), where it was calendared and taken up on the floor one month later, by a vote of 50–25. The Chairman of the Committee, Senator Claiborne Pell, announcing the Committee action, stated that he had found McGarry to have "the requisite statutory qualifications of maturity, experience, and impartiality to carry out his responsibilities on the Commission" (124 Cong.Rec. S19051 (daily ed. Oct. 13, 1978)). The matter was debated on two successive days near the end of the congressional session, and a number of Senators engaged in what may loosely be characterized as a filibuster.[5] On

---

2. Neil Staebler, holdover member of the Commission, is joined as plaintiff in this action by Common Cause, a non-profit membership corporation; David Cohen, president of Common Cause; and Nan Waterman, Chairwoman of Common Cause. It is not necessary to examine the standing of the plaintiffs other than Staebler (see *Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26, 44, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976); *Schlesinger v. Reservists Committee to Stop the War*, 418 U.S. 208, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974)), for his standing to bring the action is not contested by defendants. However, for the sake of clarity of exposition, this Opinion will generally refer to Staebler as the plaintiff.

3. Pursuant to 2 U.S.C. § 437c(a)(2)(A)(i), in order to establish staggered terms, two of the original members were appointed to serve less than one year, until April 30, 1977.

4. In addition to the President, the defendants are John McGarry and Secretary of State Cyrus Vance, who recorded McGarry's certificate of appointment. The Federal Election Commission was originally a defendant but has since been dismissed from the action by agreement of the parties.

5. Senator Mark Hatfield and Senator Orrin G. Hatch, after making remarks, indicated that they would not yield their right to the floor. 124 Cong.Rec. S19051–058; 124 Cong.Rec. S18758–61 (daily ed. Oct. 13 and 14, 1978).

October 15, 1978, the Senate adjourned *sine die* without voting on the nomination, which thereupon again automatically lapsed.

On October 25, 1978, while Congress was in recess, President Carter, relying upon his recess appointment powers under Article II, Section 2, Clause 3 of the Constitution,[6] appointed McGarry to the Staebler seat. The nominee was sworn in and received his certificate of appointment from the Secretary of State on the same day. The following day this action was filed to enjoin McGarry's appointment as exceeding the President's powers under the Recess Appointments Clause and as violating Staebler's statutory right to retain his seat on the Commission until a successor is nominated by the President and confirmed by the Senate. The matter is now before the Court on cross motions for summary judgment.[7]

## II

Except for such constitutional questions as may be involved (see pp. 593–601, *infra*), the issue before the Court is whether a vacancy existed on the Federal Election Commission when McGarry was appointed. Resolution of that issue, in turn, depends upon the construction to be given to the Federal Election Campaign Act, specifically 2 U.S.C. § 437c(a)(1) and (a)(2) which provide:

(a)(1) There is established a commission to be known as the Federal Election Commission. The Commission is composed of the Secretary of the Senate and the Clerk of the House of Representatives, ex officio and without the right to vote, and 6 members appointed by the President of the United States, by and with the advice and consent of the Senate. No more than 3 members of the Commission appointed under this paragraph may be affiliated with the same political party.

(2)(A) Members of the Commission shall serve for terms of 6 years, except that of the members first appointed—

(i) two of the members, not affiliated with the same political party, shall be appointed for terms ending on April 30, 1977;

(ii) two of the members, not affiliated with the same political party, shall be appointed for terms ending on April 30, 1979; and

(iii) two of the members, not affiliated with the same political party, shall be appointed for terms ending on April 30, 1981.

(B) A member of the Commission may serve on the Commission after the expiration of his term until his successor has taken office as a member of the Commission.

(C) An individual appointed to fill a vacancy occurring other than by the expiration of a term of office shall be appointed only for the unexpired term of the member he succeeds.

(D) Any vacancy occurring in the membership of the Commission shall be filled in the same manner as in the case of the original appointment.

Plaintiff argues that these provisions entitle him to hold office as a member of the Commission until a successor has been nominated and confirmed by the Senate, while defendants contend that during the period when Congress is not in session a successor to Staebler may be appointed and may take office as a result of the exercise of the President's recess appointment powers. Both parties rely on the statutory language, legislative history, prior practice, state court decisions, and constitutional guides to construction. These matters will be examined *seriatim*.

---

6. Art. II, Sec. 2, Clause 3 of the Constitution provides that "The President shall have Power to fill up all Vacancies that may happen during the Recess of the Senate, by granting Commissions which shall expire at the End of their next Session."

7. By stipulation between the parties, McGarry has been acting as a member of the Commission during the pendency of this action, and Staebler is being provided office space and is being kept informed of Commission activities.

Plaintiff's statutory argument may be summarized as follows. Under clause (a)(2)(B) of the Act he is entitled to remain on the Commission until his successor has legally taken office, and under clauses (a)(1) and (a)(2)(D) any member of the Commission—including plaintiff's successor—may take office only upon nomination by the President and confirmation by the Senate. Since neither McGarry nor anyone else has ever been confirmed by the Senate for the Staebler seat, no vacancy for the President to fill by way of a recess appointment has arisen, and plaintiff accordingly is still lawfully entitled to the office of a member of the Commission.

It might be observed initially that this argument contains elements of circularity. Plaintiff contends both that a vacancy on the Commission may be filled only by nomination and confirmation, and that no vacancy exists until a successor to a holdover commissioner has been nominated and confirmed. If that be a correct analysis, the creation of a vacancy and its extinction by the appointment of a successor always and inevitably occur at the same instant and by the same act (*i. e.*, an affirmative vote on a nomination by the Senate). While in theory it is not impossible for the Congress to have devised this kind of a circular scheme, it certainly constitutes a somewhat implausible method for organizing governmental operations and for that reason should not be attributed to Congress in the absence of persuasive evidence that this is what was intended. One problem with the statute as so construed is that it would saddle the process of selecting officials with awkward and unnecessary tensions. On what basis, for example, would the President recruit an individual for an office and submit his nomination to the Senate at a time when, in theory, no vacancy yet exists? Moreover, not only would the dates when vacancies occur on the Commission be uncertain; so would the dates when the terms of office of future commissioners begin, for these terms would have to be adjusted constantly to take account of holdovers. Such uncertainties and ambiguities would at a minimum upset the carefully designed staggered six-year term plan embodied in clause (a)(2)(A). See note 40, *infra*. In short, the interpretation proffered by plaintiff is burdened with the baggage of peculiar practical difficulties.

Substantively, plaintiff's argument rests on two principal premises: first, that a vacancy on the Federal Election Commission does not come into being when the statutory term[8] of a member comes to a close, but only when that person loses his right to that office at the expiration of the holdover term[9] by virtue of the lawful appointment of a successor; and second, that a successor may legally be appointed only through nomination by the President and confirmation by the Senate. In the Court's view, neither of these premises is supported by the statutory language.

In elaboration of his first premise, plaintiff argues that there cannot be a vacancy as long as someone is by law entitled to occupy an office, and that clause (a)(2)(B) provides him with such an entitlement, to be extinguished only by the lawful appointment of his successor. Critical to that analysis is the assumption that under the statute a vacancy comes into being only at the end of holdover terms created by clause (a)(2)(B), or, to put it another way, that "vacancy" relates to the status of the person occupying the office rather than to the statutory duration of the office itself. The difficulty with that assumption is that, to the extent that "vacancy" is defined in the statute, it is defined as occurring at the conclusion of the statutory six-year term of office, rather than as coming about by the termination of a clause (a)(2)(B) holdover entitlement.

Clause (a)(2)(C), while not directly defining the term "vacancy," comes close to do-

---

**8.** As used in this context, the phrase "statutory term" is synonymous with the six-year term (or the lesser term in the case of the original appointees) provided for under clause (a)(2)(A).

**9.** As used herein, "holdover term" means the permissive period of service established by clause (a)(2)(B) which follows the statutory term.

ing so. That clause mandates that a "vacancy occurring other than by expiration of a term of office" shall be filled only for the remainder of the unexpired term. The plain implication of that language is that a vacancy does indeed occur as a result of and contemporaneously with the expiration of the term of office—not some subsequent time as contended for by plaintiff. It is relatively immaterial whether clause (a)(2)(C) be regarded technically as a "definitional" phrase; at a minimum it expresses the congressional understanding and purpose that a vacancy shall occur upon the expiration of the term of office. It is also clear that "term of office" means the statutory term, for both clauses (a)(2)(A) [10] and (a)(2)(B) [11] of the law use that expression [12] to mean the statutory term, as distinguished from the statutory *plus* the holdover term. Thus, it appears that within the meaning of the statute a vacancy existed in the Staebler office ever since April 30, 1977, and if that is so, that vacancy could of course be filled by any constitutionally-permissible method—by nomination and confirmation or, when the Senate was not in session, by a recess appointment.

Even if plaintiff's view of the creation of a vacancy were to be adopted instead of the more plausible construction based on the language of clause (a)(2)(C), that is, if the Court were to hold that the office of a member of the Federal Election Commission did not automatically become vacant

upon the expiration of Staebler's statutory term, but is becoming vacant only at some subsequent time, plaintiff could still not prevail unless he is also correct in his contention that the law requires vacancies on the Commission to be filled only by nomination by the President and confirmation by the Senate.

In that respect, plaintiff argues that the President acting alone is not empowered to appoint a successor to him because of the provision in clause (a)(2)(D) that "any vacancy . . . shall be filled in the same manner as in the case of the original appointment," and the further provision in clause (a)(1) to the effect that the members of the Commission shall be appointed by the President by and with the advice and consent of the Senate.

That argument, however, proves too much. As their plain language indicates, clauses (a)(1) and (a)(2)(D) do not distinguish in any way among vacancies by their origin. If plaintiff is right in his argument, therefore, the consequence would be that nomination by the President and confirmation by the Senate would be necessary not only to fill vacancies occurring as a consequence of the expiration of a term but also to fill all other vacancies, however they may arise, including those resulting from the death, resignation, or removal of the incumbent. [13] This contention necessarily presup-

10. "Members of the Commission shall serve for *terms* of 6 years, except that of the members first appointed—(i) two of the members . . shall be appointed for *terms* ending on April 30, 1977; (ii) two of the members, . . . shall be appointed for *terms* ending on April 30, 1979; and (iii) two of the members . . . shall be appointed for *terms* ending on April 30, 1981" (emphasis added).

11. "A member of the Commission may serve on the Commission after the expiration of his *term* . . . ." (emphasis added).

12. The expressions "term of office" and "term" are obviously employed interchangeably.

13. While plaintiff's Memorandum in Opposition to Defendants' Cross Motion for Summary Judgment contends (p. ——) that "the clear language of 2 U.S.C. § 437c(a)(2)(D) . . . expresses Congress' intention that *all* positions

on the Commission are to be filled by nomination and confirmation" (emphasis added), during oral argument plaintiff conceded through counsel that to extend the language in question to other vacancies (*i. e.*, those arising from deaths or resignations) would be unreasonable, and he advanced the proposition that the literal language of these clauses should be applied only to vacancies resulting from the expiration of a term. Yet since that language without any ambiguity treats all vacancies alike, it is not clear on what basis the Court would be entitled to pick and choose among them by category. No such basis exists in fact, for even accepting plaintiff's "vacancy" argument, it is more reasonable to assume that the creation of a vacancy and its extinction (see p. 589 *supra*) can occur both when the President makes a recess appointment and when there is a nomination and confirmation, than to restrict the vacancy creation and extinction process to the latter

poses that, insofar as the Federal Election Commission is concerned, Congress intended to deprive the President completely of his power to make recess appointments.

In the Court's view, so broad an invasion of the normal operations of the recess appointment process could not appropriately be inferred on the basis of the relatively strained argument advanced by plaintiff, especially since to do so would lead to an almost certainly unconstitutional result. Even assuming *arguendo,* without deciding, that Congress has the power to enact a prohibition on recess appointments with respect to vacancies occurring as a result of the expiration of terms of office (on the theory that it is then merely defining such terms of office and thus constraining the President's removal authority),[14] it certainly lacks that authority, consistently with Article II, Section 2, Clause 3 of the Constitution, with respect to appointments to fill other vacancies. On that basis alone, therefore, the broad construction of clause (a)(1) and (a)(2)(D) advocated by plaintiff cannot stand.

Moreover, there is no basis either in the language of the statute or in its legislative history to support the conclusion that Congress meant to rein in the President in such an unprecedented manner. In the absence of a clearly-expressed legislative intent, the Court will not speculate that the Congress sought to achieve a result which would be both unusual and probably beyond its constitutional power.

In short, to construe the statute to prohibit all recess appointments to the Federal Election Commission would be unreasonably broad and probably unconstitutional; to construe it not to prohibit such appointments defeats plaintiff's case; and to construe it to prohibit some such appointments

but not others (see note 14, *supra*) finds no support in the language of the statute.

For these reasons, it appears that, considering only the bare bones of the statutory language, the President had the authority to make the McGarry appointment, and that McGarry is a lawful member of the Federal Election Commission. This interpretation of the statute is not wholly devoid of uncertainties: no doubt it would have been preferable had the Congress defined the term "vacancy" in so many words. But it is plain nevertheless that the language of the Federal Election Campaign Act so heavily supports the availability of the recess appointment power in this situation that the apparent validity of the President's actions may be overcome only if extrinsic means of construction point to a contrary conclusion. These other means of ascertaining the meaning of the statute will now be examined under the following headings: (1) legislative history, (2) prior practice and usage, (3) state court decisions, and (4) constitutional policy.

### III

The legislative history of the Act creating the Federal Election Commission is neither voluminous nor conclusive. See 1976 U.S. Code Cong. and Admin.News, pp. 929–992. The holdover provision—for which there was no equivalent in the earlier versions of the statute—was not explained in the Committee reports[15] or on the floor of the House. The few comments that are at all relevant were made during the Conference Committee deliberations and on the floor of the Senate.

As the Conference Committee was considering the bill, Senator Howard Cannon,

---

situation. Thus, the only reasonable conclusion is that either vacancies on the Federal Election Commission may be filled by recess appointment, or they may not. Plaintiff's suggestion that the Court might interpret the statute to allow the President to fill some vacancies by recess appointment but to preclude him from filling others by that method is both unsupported and unsupportable.

14. See *Humphrey's Executor v. United States,* 295 U.S. 602, 55 S.Ct. 869, 79 L.Ed. 1611 (1935).

15. The provision is merely mentioned in the House Committee Report. H.R.Rep.No.917, 94th Cong., 2d Sess. 18 (1976).

Chairman of the Senate Conferees, stated that he and his colleagues had no objection to the House-passed holdover provision. In response, Representative Wayne Hays, Chairman of the House Conferees, replied that "it is not a matter of great significance. It is a usual thing to appoint someone until a successor is appointed and qualified." Transcript of meeting of April 7, 1976, of House-Senate Conferees, pp. 8–9. Very little can be read into that unadorned and almost offhand statement. It was not made in the context of a discussion regarding recess appointments but merely explained that the House had included a holdover provision, presumably well familiar to the members of the Conference.

The Court finds it difficult to believe that, had the Congress intended to take the significant step of attempting to curtail the President's constitutional recess appointment power, or even to legislate in the area of that power, it would not have considered the matter with more deliberation or failed to declare its purpose with greater directness and precision. No such deliberation or direction can be found in this legislative history.[16]

Plaintiff suggests that the words of Chairman Hays at a minimum incorporate by reference provisions in other holdover statutes which allow officials to continue in office until their successors are "appointed and qualified." The language Congressman Hays used was not incorporated into the statute itself, but clause (a)(2)(B) instead uses the less compelling words that a member of the Commission may continue to serve "until his successor has taken office." One might well conclude that, by omitting the usual language "until a successor is appointed and qualified," Congress contemplated the recess appointment problem and

explicitly meant to authorize such appointments. But that, too, would be reading too much into Chairman Hays' statement. It appears to the Court that he, and the Congress generally, intended by the inclusion of the holdover provision ultimately adopted to do no more nor less than to follow the customary law and practice with respect to holdovers and their successors.

That much said, however, the Court is unable to agree with plaintiff that the legislative histories of similar holdover provisions in other laws show that they were designed to preclude recess appointments. Plaintiff cites a number of statements in congressional committee reports on statutes which created various independent regulatory agencies, including the Interstate Commerce Commission, the Federal Trade Commission, the Civil Aeronautics Board, the Federal Power Commission, the Securities and Exchange Commission, and the Federal Communications Commission. Several of these committee reports make reference to holdover provisions, and there are statements indicating that it was the purpose of such provisions to prevent the disruption caused by vacancies and to provide the Senate with the opportunity to pass upon the nomination of a successor to the holdover member. E. g., S.Rep.No.589, 74th Cong., 1st Sess. 1 (1935) (Interstate Commerce Commission); H.R.Rep.No.1774, 75th Cong., 3rd Sess. 1 (1938) (Federal Trade Commission); H.R.Rep.No.2360, 85th Cong., 2d Sess. (Civil Aeronautics Board); H.R.Rep. No.1917, 86th Cong., 2d Sess. 2 (1960) (Federal Power Commission, Securities and Exchange Commission, Federal Communications Commission). However, in none of these reports is there any indication that the Committees considered, much less that they intended to rule out, the constitutionally-prescribed recess appointment option.

16. By the same reasoning one may largely discount other similar scattered and unfocused statements, e. g., the statement in a House report that the members of the Commission were to be appointed by the President and confirmed by the Senate (H.R.Rep.No.94–917, 94th Cong., 2d Sess. 2–3 (1976); 122 Cong.Rec. H3778 (daily ed. May 3, 1976)); and that in a report issued several years after the enactment of this statute, to the effect that Staebler "continued to sit on the Commission, as allowed by 2 U.S.C. § 437c(a)(2)(B), until his successor is confirmed" (Exec.Rep.No.95–28, 95th Cong., 2d Sess., p. 7 (1978)).

The thrust of all the comments is that continuity in office is important and that the disruption caused by prolonged vacancies should be avoided.[17] Considered in context, the various references to the Senate confirmation process amount to nothing more than acknowledgements that nomination and confirmation constitute the routine method of filling vacancies. They cannot be read more expansively to indicate that Congress sought by implication to rule out recess appointments in instances when they are constitutionally appropriate.

Of somewhat greater significance is a statement on the Senate floor by Senator Mark Hatfield, one of the principal opponents of the McGarry nomination, made as that nomination was being debated by the Senate on October 13, 1978, two days before the congressional adjournment. Senator Howard M. Metzenbaum, a proponent of McGarry, asked whether it was Senator Hatfield's view that "neither [McGarry nor another nominee to the Commission] can be confirmed during that session of the Senate and that they ought to be put over until January." Senator Hatfield replied that "it does not have to be put off until January . . . Article II, section 2 of the Constitution . . . provides the President with ample authority, power, and direction to make recess appointments. Recess appointments would carry through the whole of the first year of the new session of the Congress. . . ." 124 Cong.Rec. S19057. That comment has some significance, if only because it directly addresses the recess appointment issue, and because it is at least open to conjecture that it may have led the Senate majority to refrain from seeking to override the opposition of Senator Hatfield and other opponents of McGarry to a vote on his nomination during that session of the Congress. However, while of some value in these respects, this remark by a single Senator is likewise too slender a reed upon which to rest a definitive construction of this law.

## IV

■ In seeking to construe the meaning of a statutory provision, it is often appropriate to accord great, even decisive, weight to the continuous practical construction accorded the provision by those who have the responsibility to administer it. See *United States v. Midwest Oil Company,* 236 U.S. 459, 472–3, 35 S.Ct. 309, 59 L.Ed. 673 (1915); *Udall v. Tallman,* 380 U.S. 1, 17, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965); *McPherson v. Blacker,* 146 U.S. 1, 36, 13 S.Ct. 3, 36 L.Ed. 869 (1892); *Stuart v. Laird,* 1 Cranch (5 U.S.) 299, 309, 2 L.Ed. 115 (1803). Relying upon that rule, defendants claim that Presidents of the United States have consistently and continuously construed holdover language as raising no barrier to the exercise of their constitutional power under the Recess Appointments Clause, that this exercise of authority has never been challenged by the Congress or in the courts, and that this practice and usage should control the Court's decision in this instance.

**17.** See, e. g., a Senate committee comment to the effect that "one of the things that has been of some concern to your committee has been the situation created where a Board or Commission is at less than full strength during the period between the time a member's term expires and the time his successor is confirmed and takes his oath of office. This can, and has on occasion, made it impossible, particularly on a five-member Board, to reach a decision. It has worked delays in important pending actions. This has proven not only to be a handicap to the agency but may deprive the public from the benefit of the services which the agency by law is required to give . . . [and that] this amendment should eliminate the pressures for quick and hasty action where a nomination is submitted a few days prior to the expiration of a member's term. Under normal conditions this period of time should give the Senate adequate opportunity to perform its rightful function in passing upon the nomination and at the same time, afford the Chief Executive sufficient time to select a qualified successor." S.Rep.No.441, 85th Cong., 1st Sess. 2 (Civil Aeronautics Board). See also, the report of the House Committee on Interstate and Foreign Commerce on a bill to add a holdover provision to the terms of office of the members of the Federal Power Commission, the Securities Exchange Commission, and the Federal Communications Commission. H.Rep. 1917, 86th Cong., 2d Sess. 2 (1960).

According to the records maintained by the White House,[18] 116 recess appointments (in addition to the McGarry appointment) have been made by Presidents to independent regulatory agencies since 1915. While that total is impressive, only twenty of these appointments were made to agencies whose governing statutes have holdover language similar to that involved here,[19] and in only two of these were the predecessor officials holding over at the time their successors were given recess appointments. Even with respect to the remaining two appointments, the practice is somewhat cloudy. In one of these two instances, a 1956 appointment to the Federal Trade Commission, the White House requested the holdover commissioner to submit a letter of resignation which that official refused to do, and a compromise was subsequently reached permitting him to remain in office for an additional two months in order to qualify him for a higher pension. In the other case, involving a 1972 appointment to the Interstate Commerce Commission, the holdover commissioner did leave his office following the recess appointment of his successor, but he did so under protest. (Graham and Cramer, *Appointments to the Regulatory Agencies,* pp. 90–91, 94th Cong., 2d Sess., Committee Print, April 1976; and affidavit of Donald Simon). In neither instance was there a judicial or other test of the legality of the recess appointment.

Thus, on the precise issue of the authority of the President to make a recess appointment where there is a holdover provision, the history of prior practice demonstrates primarily that various Presidents[20] have acted on the assumption that they have the power to make the appointments,[21] and that the Congress did not challenge this Presidential practice, such as by failure subsequently to confirm the successor or by amendment of the relevant laws. Since there were only two instances of a potential conflict between a holdover official and a new appointee, both of which were resolved in effect by a settlement, the matter never reached an actual adversary stage, by way of litigation or otherwise. Nevertheless, the lack of a challenge, either in the courts by someone with standing to complain, or by the Congress if it felt its prerogatives had been invaded, lends some, albeit not decisive, weight to defendants' ultimate position that McGarry's nomination is valid.

Additionally, the consistent and continuous practice directly contradicts plaintiff's theory on a somewhat narrower issue. As noted at pp. 590–591, *supra,* it is a critical element of plaintiff's statutory analysis that a provision such as the one involved here, requiring nomination and confirmation, must be interpreted by necessary implication to exclude all vestiges of the President's recess appointment power. On that issue, all 116 recess appointments cited by the government have some "prior administrative practice" relevance, for the applicable statutes in terms required nomination and confirmation, without express reference to the recess appointment power. Yet recess appointments were made in all these instances, and in many of the cases the officials so appointed were subsequently nominated and confirmed, apparently without congressional challenge or protest concerning the procedure.

### V

In the absence of judicial authority in the federal system, the parties rely on decisions

---

**18.** This information was supplied for the record by an affidavit of Thomas M. Jones, Chief of the White House Records Office.

**19.** In one instance, the governing law permitted the President to remove the official (a Civil Service Commissioner) at will, and in the remaining 95 cases the relevant statutes did not contain holdover provisions.

**20.** These appointments were made by Presidents Roosevelt, Truman, Eisenhower, Johnson, and Nixon during the years 1948 to 1972.

**21.** In a number of other instances, Presidents have apparently not sought to displace sitting commissioners by recess appointments, as President Carter did not with respect to Staebler during the 1977 congressional recess.

by various state courts. In its several aspects and permutations the issue has arisen in the states on numerous occasions, but it is not possible from the precedents to formulate a uniform or consistent rule. The statutory provisions which the courts were construing were frequently not analogous or similar to those involved in this case, the powers of the chief executives with respect to recess appointments differed widely, and the results are by no means consistent.

For example, *State ex rel. Ryan v. Bailey,* 133 Conn. 40, 48 A.2d 229 (1946), and *People ex rel. Baird v. Tilton,* 37 Cal. 614, 621 (Cal.1869), directly hold that an official who is statutorily entitled to hold over may not be replaced by a recess appointment unless the successor is appointed and confirmed, while *State v. Young,* 137 La. 102, 68 So. 241 (1915), is squarely to the contrary. Decisions in other states lend more or less support to various aspects of plaintiff's[22] and defendants'[23] contentions. One commentator who surveyed the case law has aptly remarked (Davis, *The Governors' Constitutional Powers of Appointment and Removal,* 22 Minn.L.Rev. 451, 461–2 (1938)):

> There is a wide split of authority on the main question whether there is a vacancy at the end of a term when there is a holdover provision, and no one has been selected to fill the office. Upholding the affirmative proposition that there is no vacancy because there is someone actually in the office, we find the states of California, Georgia, Indiana, Kansas, Maryland, Michigan, Missouri, Montana, New Jersey, New Mexico, North Carolina, Ohio, Oregon, Pennsylvania, South Carolina, Tennessee, Utah and Wyoming. In the opposing group, holding that there is a vacancy which the governor can fill, even though the holdover is still in office, there are the states of Colorado, Connecticut, Florida, Kentucky, Louisiana, Minnesota, Mississippi, Missouri and Texas.

There is some doubt as to the proper place to put Mississippi, for there have been decisions on both sides, but the latest pronouncement of its court seems to place it in the second group. Missouri, likewise, has decisions on both sides of the question, but this is because of the question as to who has the power to make the subsequent appointment.

> This question as to the nature and location of the appointing power is, I believe, the key to the whole situation. Those courts which hold that the governor cannot make the appointment state that the appointment must be made by the power who has the authority to make the original appointment, the governor and senate, the legislature, or some other individual or body, as the case may be. Those on the opposite side hold that it does not make any difference who this appointing power may be because there is a vacancy, and the governor has the power to fill vacancies. On the decision as to these two related points rests the whole difference of opinion that has been expressed. If there is no general or specific holdover provision that applies to a certain office, the weight of authority is that none will be implied, and that the governor can therefore make an appointment (citations omitted).

Another author has similarly noted (Note, *Public Officers: Effect of A Hold Over Clause Upon Tenure,* 10 Temple L.Q. 191, 199 (1935)):

> The confused state of the law in respect to an incumbent's right to hold over after the expiration of his term is of long standing and there is little evidence in the decisions of any progress toward a solution. This confusion proceeds not from the statutes but from the reasoning of the courts and the evidence of this lies

---

**22.** *Shackelford v. West,* 138 Ga. 159, 74 S.E. 1079, 1080 (1912); *Walker v. Hughes,* 36 A.2d 47, 50 (Del.1944); *Ash v. McVey,* 85 Md. 119, 36 A. 440, 442 (1897); *Ham v. State ex rel. Blackman,* 162 Ala. 117, 49 So. 1032, 1033 (1909); *Molnar v. Aurora,* 38 Ill.App.3d 580,

348 N.E.2d 262, 265 (1976); see also, 67 C.J.S. Officers § 48b, at p. 204, note 15.

**23.** *Walsh v. People,* 72 Colo. 406, 211 P. 646, 648 (1922); *Dixon v. Caudill,* 143 Ky. 623, 136 S.W. 1043 (1911); *State ex rel. Bickford v. Cocke,* 54 Tex. 482 (1881).

in the conflicting holdings upon identical statutory provisions in the same jurisdiction and between different jurisdictions, in the frequency of vigorous dissents, and in the persistent use of diametrically opposed theories to reach identical conclusions. Such inconsistency is inevitable where decisions are determinable upon such grounds as public policy, public interest, legislative and constitutional intent, the balancing of executive and legislative prerogatives, and the protection of the sovereign rights of the people against invasion by legislative or executive abuse of power.

These comments appear accurately to characterize the condition of the law in the state courts. The decisions of those courts are simply not sufficiently consistent for the drawing of any conclusion having significant weight, and accordingly they provide little guidance to the Court with respect to the instant case.

## VI

■ Finally, it is appropriate to consider the relationship of the Federal Election Campaign Act to the Constitution. This part of the statutory analysis will be reviewed from two aspects: first, from the point of view of the familiar canon that statutes should be construed, if possible, to give them an interpretation that comports with constitutionality; and second, in light of the need to consider the overall federal constitutional system of checks and balances as it relates to the proper allocation of authority between the executive and legislative branches in the politically sensitive area in which this law operates.

■ It is an established rule of statutory construction that, where a serious doubt of constitutionality is raised, the Court should ascertain whether a construction is possible by which the question may be avoided and give the law that meaning if this can fairly be done. *Crowell v. Benson*, 285 U.S. 22, 62, 52 S.Ct. 285, 76 L.Ed. 598 (1932); *Pernell v. Southall Realty*, 416 U.S. 363, 365, 94 S.Ct. 1723, 40 L.Ed.2d 198 (1974); *Ashwander v. Tennessee Valley Authority*, 297 U.S. 288, 348, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (Brandeis, J., concurring). It is apparent that, when so viewed the Federal Election Campaign Act should not be interpreted to favor Staebler's continuation in office, for such a construction might well unconstitutionally infringe upon the powers of the President under the Recess Appointments Clause.[24]

There was no debate on Article II, Section 2, Clause 3 in the meetings of the Constitutional Convention.[25] See 2 M. Farrand, *Records of the Federal Convention of 1787* (rev. ed. 1966), pp. 533, 540, 574, 600. The single substantive comment by any authoritative source on the Recess Appointments Clause appears to be that of Alexander Hamilton who stated in *The Federalist No. 67* (Wesleyan ed. 1961), p. 455, that "as vacancies might happen in [the Senate's] recess, which it might be necessary for the public service to fill without delay, the succeeding clause is evidently intended to authorize the president, *singly*, to make temporary appointments. . . ." Since that statement in essence merely restates the language of the constitutional provision itself,[26] it does not especially illuminate the

24. It might be noted that if any and all restrictions on the President's recess appointment power, however limited, are prohibited by the Constitution, 5 U.S.C. § 5503, see note 39, *infra*, might also be invalid. That question, however, is not before the Court in this case.

25. The Recess Appointments Clause was first drafted in Hamilton's plan of government, adopted upon motion of Richard Spaight of North Carolina, and left unchanged by the Committee of Style. 2 Farrand, *The Records of the Federal Convention of 1787*, (rev. ed. 1966), pp. 533, 540, 574, 600.

26. The reference to the need for filling vacancies without delay ambiguously supports both plaintiff's position that the Clause is to be reserved for instances of actual necessity and defendants' view that it may be employed by the President whenever the Congress is not in session. The same is true of Hamilton's other comment (*The Federalist No. 67*, at p. 455) that the Recess Appointments Clause is a "supplement" to the Appointments Clause, establishing an "auxiliary method of appointments, in cases to which the general method was inadequate."

issues presented by this case. The meaning of the provision can thus be ascertained only from its apparent purpose.

In that regard, plaintiff argues that the Clause was designed to operate only in the unusual situation when no person is available to occupy a particular office or, in other words, that its purpose was solely to preclude a hiatus in necessary governmental operations. If that interpretation is correct, the President would be prohibited from making a recess appointment when a term of office has expired, as long as someone with a permissive claim to the office is still serving.

■ The Court is not persuaded that this was the intention of the framers of the Constitution. There is nothing to suggest that the Recess Appointments Clause was designed as some sort of extraordinary and lesser method of appointment, to be used only in cases of extreme necessity. Some constitutional provisions, such as the First Amendment, have a preferred standing, but otherwise all parts of the Constitution are of equal validity and weight and should be construed in light of the principle that the entire Constitution must be regarded as one whole. *Prout v. Starr*, 188 U.S. 537, 543–4, 23 S.Ct. 398, 47 L.Ed. 584 (1903). The framers did not indicate that the appointment process was to be an exception to this general rule of equality, and no court has so held.[27] In the absence of persuasive evidence to the contrary, it is therefore not appropriate to assume that this Clause has a species of subordinate standing in the constitutional scheme, or that it is not as operative when Congress is not in session as the Nomination and Confirmation Clause (Article II, Section 2, Clause 2) is when Congress is available.

Two limitations on the applicability of the Recess Appointments Clause are part of the Clause itself—that it may be invoked only when the Senate is in recess, and that the President's recess commissions "shall expire at the End of [the next congressional] Session." These limitations constitute substantial safeguards against abuse by the Executive (see *infra*, p. 600), and they may be presumed to express the view of the framers concerning the degree to which the executive authority in this area was to be circumscribed. There is no justification for implying additional restrictions not supported by the constitutional language.

Recess appointments have traditionally not been made only in exceptional circumstances, but whenever Congress was not in session.[28] Many Supreme Court justices and innumerable federal judges began their careers by way of recess appointments,[29] and as noted *supra*, in recent decades there have been at least 116 recess appointments to independent regulatory agencies. Cf. *United States v. Allocco, supra* note 28, where the court held that a recess appointment of a judge was valid even though the vacancy arose at a time when the Senate was in session. It must also be remembered that until this century Congress was generally in session for only brief periods during the year. It is unlikely that the framers would have intended to limit the power to fill offices to only those few months.

■ There is thus *no evidence*, semantic, historic, philosophic, or in prior practice or usage, to support plaintiff's view that the recess appointment power was intended to be restricted to instances of absolute need, *i. e.*, when no individual is available to

27. Story's view of the Recess Appointments Clause, that it applies only in cases of death, resignation, promotion, or removal (J. Story, *III Commentaries on the Constitution* 411 (reprinted ed. New York 1977) (1st ed. Boston 1833) has not been followed in practice or by the courts. See the excellent discussion in *United States v. Allocco*, 305 F.2d 704, 709–15 (2d Cir. 1962), *cert. denied*, 371 U.S. 964, 83 S.Ct. 545, 9 L.Ed.2d 511 (1963).

28. The President is not precluded from making a recess appointment by the circumstance that the nomination of the appointee was previously ignored by the Senate. *Matter of Farrow*, 3 F. 112 (D.Ga.1880); 1 Op.Atty.Gen. 631 (1823).

29. Note, Recess Appointments to the Supreme Court, 10 Stan.L.Rev. 124, 132 (1957); House Committee on the Judiciary, 86th Cong., 1st Sess., *Recess Appointment of Federal Judges*, at iii (Comm. Print 1959); *United States v. Allocco, supra.*

occupy the office on any tenable basis. The more persuasive conclusion to be drawn from the available evidence is that recess appointments may validly be made during congressional recesses, and that the persons so appointed may then begin to serve, subject to the constitutional limitation that, unless confirmed, their service will terminate at the conclusion of the next session of Congress. It follows that a construction of 2 U.S.C. § 437c which would preclude the President from making a recess appointment in this situation—*i. e.*, during a Senate recess and after the statutory term of the incumbent has expired—would seriously impair his constitutional authority and should be avoided it if is possible to do so.

## VII

The same result follows from an analysis of broader constitutional considerations.

■ This case, like *Buckley v. Valeo, supra*, necessarily involves not merely the interests of the parties but also the proper distribution of power between the branches of government with respect to appointments to high office. Madison has noted that a partition of power "must be supplied by so contriving the interior structure of government as that its several constituent parts may, by their mutual relations, be the means of keeping each other in their proper places." *The Federalist No. 51* (Wesleyan ed. 1961). The Constitution must be interpreted in light of that fundamental princi-

ple of checks and balances. *Buckley v. Valeo, supra*, 424 U.S. at 120, 96 S.Ct. 612; *Youngstown Sheet & Tube Co v. Sawyer*, 343 U.S. 579, 635, 72 S.Ct. 863, 96 L.Ed. 1153 (1952).

■ As a necessary incident to a decision in this case a choice must be made between a construction of the Act supporting the exercise of executive authority and one which would vest greater power in the legislative branch. Given the need for such a choice, the constitutional scheme of checks and balances in this particular instance favors the claims of the executive.[30]

Under the constitutional plan, the several branches share a degree of responsibility with respect to a number of governmental functions.[31] Even where there is such a sharing, however, one branch is generally assigned the preeminent or the more active role. Thus, the legislative branch of government almost by definition exercises supremacy with respect to the enactment of laws, the raising of revenue, and the appropriation of funds;[32] while the executive is preeminent in the conduct of military and foreign affairs, including the negotiation of treaties.[33] To be sure, laws cannot be enacted, revenues cannot be raised, and funds may not be appropriated without consideration of the President's various powers, including the power of the veto; and the conduct of military and foreign affairs not infrequently requires the concurrence of the

**30.** The Commission, however its members may be appointed, must of course act independently of both the President and the Congress in its operations and decisions. See Hearings on Bills to Amend the Federal Election Campaign Act of 1971 as Amended and to Reconstitute a Federal Election Commission, before the Subcommittee on Privileges and Elections of the Senate Committee on Rules and Administration, 94th Cong., 2d Sess. 1 et seq. (1976).

**31.** "While the Constitution diffuses power the better to secure liberty, it also contemplates that practice will integrate the dispersed powers into a workable government. It enjoins upon its branches separateness but interdependence, autonomy but reciprocity." *Youngstown Sheet & Tube Co. v. Sawyer, supra*, 343 U.S. 635, 72 S.Ct. 870 (Mr. Justice Jackson, concurring).

**32.** *Youngstown Sheet & Tube Co. v. Sawyer, supra*; *National Cable Television Association, Inc. v. United States*, 415 U.S. 336, 94 S.Ct. 1146, 39 L.Ed.2d 370 (1974).

**33.** *United States v. Pink*, 315 U.S. 203, 62 S.Ct. 552, 86 L.Ed. 796 (1942); *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 57 S.Ct. 216, 81 L.Ed. 255 (1936); *Chicago & Southern Air Lines v. Waterman S. S. Co.*, 333 U.S. 103, 68 S.Ct. 431, 92 L.Ed. 568 (1948); *Flota Maritima v. Motor Vessel Ciudad De La Habana*, 335 F.2d 619 (4th Cir. 1964); *National Savings & Trust v. Brownell*, 95 U.S.App.D.C. 370, 222 F.2d 395 (1955), *cert. denied*, 349 U.S. 955, 75 S.Ct. 885, 99 L.Ed. 1279 (1955).

Congress through such actions as the appropriation of the necessary monies or the Senate's advice and consent to treaties and the nomination of military and diplomatic officials. Nevertheless, the generalization still holds true that with respect to some of these responsibilities the Congress is envisioned to be predominant and with respect to others the President.[34]

In the context of this overall design, the primary or initiating role in the appointment of officials is the President's. That much has been clear from the time Attorney General Henry Stanberry wrote in 1866 (12 Op.Atty.Gen. 32, 41–2 (1866)):

> We must not forget that this power of appointment to office is essentially an executive function. It belongs essentially to the executive department rather than to the legislative or judicial. If no provision on the subject had been made by the Constitution, it would have been held appurtenant to the President as the head of the executive department, specially charged with the execution of the laws

> .   .   .

to the reiteration by the Supreme Court in *Buckley v. Valeo, supra* (424 U.S. at 132, 96 S.Ct. at 688) that

> .   .   .   unless their selection is elsewhere provided for, *all* Officers of the United States are to be appointed in accordance with the [Appointments] Clause. Principal officers are selected by the President with the advice and consent of the Senate. Inferior officers Congress may allow to be appointed by the Presi-

dent alone, by the heads of departments, or by the Judiciary. No class or type of officer is excluded because of its special functions. The President appoints judicial as well as executive officers.[35]

This does not mean, of course, either that Presidential power in this field is absolute—obviously it is not—or that every law dealing with appointments to office must necessarily be construed to favor the greatest possible role for the executive branch. But where, as here, there is an ambiguity,[36] and where, depending upon the resolution of that ambiguity the President or the Congress may achieve a stronger voice (see *infra*), it is appropriate to consider that the President was intended by the framers of the Constitution to possess the active, initiating, and preferred role with respect to the appointment of officers of the United States.

While a "worst case scenario" is in a sense antithetical to a constitutional system which in large measure depends for its smooth operation on a generous measure of self-restraint by the various branches,[37] and would in all likelihood collapse without such restraint, it is still a useful tool for interpreting a statute which impacts upon the powers of these branches, and which, depending upon the construction ultimately adopted, may significantly change their authority relative to each other. Certainly, if one construction would make it possible for a branch of government substantially to enhance its power in relation to another, while the opposite construction would not have such an effect, the principle of checks

---

34. The existence of this constitutional plan is not negated by the circumstance that in some areas the balance has in practice shifted over the years, in that, for example, the President has assumed leadership in budget-making or the Congress has acquired the *de facto* dominant role with respect to the selection of federal judges. In some respects, moreover, there has recently been a swing of the pendulum back to the original constitutional design, as by the creation of budget committees in the Congress and the attempt by the President to establish commissions which would more readily divorce the judicial selection process from senatorial considerations.

35. The reference in the quoted portion from *Buckley v. Valeo* to the Appointments Clause distinguishes the President's powers under that Clause from appointments by the Congress, not from actions taken pursuant to the Recess Appointments Clause.

36. Giving the plaintiff the benefit of every doubt on the statutory language. See Part II *supra*.

37. The system would break down if each branch extended its powers to their logical extremes; *e. g.*, if the President refused to provide police protection for the Congress and the courts, or if the Congress declined to appropriate funds for the White House staff.

and balances would be better served by a choice of the latter interpretation. It is useful to examine the contentions of the parties in that light.

If the Federal Election Campaign Act were to be construed as suggested by defendants, the most serious possible consequence would be that McGarry, should he remain unconfirmed, would serve until the end of the next session of the Congress, then to be replaced by another nominee of the President whose name would have to be submitted to the Senate and who would have to pass the scrutiny of that body. Executive control of this seat on the Federal Election Commission would thus be limited in duration,[38] and it would be subject to the constant risk of adverse Senate action. See note 42 *infra.* Under plaintiff's construction, on the other hand, it is conceivable that a member of the Commission, once appointed and confirmed, albeit for a limited term, could remain in office indefinitely notwithstanding the expiration of that term, as long as the Senate refuses to confirm any successor, or indeed, as long as a significant number of members of the Senate is able to prevent the nomination of a potential successor from coming to a vote. The President would be totally powerless by constitutional means to protect himself and the power to nominate officials conferred upon him by Art. II, Sec. 2 of the Constitution from such usurpation. Clearly, the interpretation proffered by plaintiff is far more unbalancing of the harmonious interplay between the branches than that of defendants (cf. *The Federalist No. 51*, pp. 323–4; *The Federalist No. 48*, pp. 308–310) and should therefore be avoided if possible.

This analysis and these conclusions are especially compelling as applied to this particular statute, for the Federal Election Commission, because of its statutory duties and powers, is a politically most sensitive body. Congress was well aware of that sensitivity, and it sought to safeguard against undue domination by any one center of power by requiring (1) that the members of the Commission shall serve for staggered terms, and (2) that no more than three members of any political party may be appointed to the six seats for which the Executive has responsibility. Yet it is readily apparent that a construction which allows the indefinite retention of a "lame duck" commissioner pending the resolution of a deadlock concerning his successor would as a practical matter upset this carefully designed scheme. A President serving a single term is entitled under the law to make four appointments or nominations to the Federal Election Commission. Depending upon the duration of a stalemate—and such a stalemate could well be lengthy, especially if the Senate and the Presidency were controlled by opposing political parties—a President might be deprived of the opportunity of making some or all of these appointments, with the consequence that the preceding Administration would monopolize the membership of the Commission.

As a matter of historical fact, the Senate's failure to act on McGarry either in 1977 or in 1978 has resulted both in an interference with the staggered-term plan of the statute [39] and a *de facto* extension of the incumbent's term of office. Staebler, the choice of a previous President, was nominated and confirmed only for an 11-month term; yet he has already served for over 30 months and, should the Court hold that the law precludes the President from

---

38. 5 U.S.C. § 5503 further protects the interests of the Senate by providing that when the President by recess appointment fills a vacancy which, as in this instance, already existed while the Senate was still in session, the appointee may not be paid unless his name is resubmitted to the Senate for its consideration within forty days of the beginning of the next following session of Congress.

39. If plaintiff prevails in this litigation, his successor, whenever he might be confirmed, would begin and end his term wholly outside the staggered-term framework envisaged by clause (a)(2)(A), and so would all the commissioners succeeding him. A possible alternative—the deduction of the time of Staebler's service from the six-year term of his successor—would be equally incompatible with the congressional design, and in any event is not supported by the statutory language.

making a recess appointment,[40] it is not inconceivable that he would continue to serve well into 1979 and perhaps into 1980 or beyond. During that entire period, although he has never been nominated, confirmed, or appointed to a full term, Staebler would be sitting as a member of the Commission, presumably not by virtue of any conscious decision with respect to him, but solely because another individual has not been confirmed.

Plaintiff suggests that the Senate was concerned about alleged financial irregularities in McGarry's financial affairs, and that it sent the White House a "clear message" which the President chose to ignore (Memorandum, pp. 34–40). McGarry's qualifications are not in this record, and the wisdom of the President's choice is not in any event for this Court to evaluate. It should be noted, however, that, had the Senate determined that McGarry was not qualified or otherwise unsuitable for the position, it could have rejected the nomination, and the President would then have been unable to grant a recess appointment to McGarry.[41] Since the Senate failed to do so, there is no implication that a recess appointment is improvident.

Opportunities for overreaching and deadlock exist in any scheme of checks and balances such as that established by the United States Constitution; however, it makes little sense to add gratuitously both to potential distortions in the general scheme and to the encouragement of one branch to interfere with the legitimate responsibilities of the others. The constitutional balance wheel is apt to be more true when a branch is not tempted, unnecessarily, to take on the powers and duties of another.

The construction advocated by plaintiff would do just that. It would in practice legitimize the Senate's acting not merely to consent or to refuse to consent to nominees as their names are being submitted by the President, but to provide the Senate with the *de facto* authority to decide whether persons who already hold office should be retained long beyond the expiration of their statutory terms. Should that occur, the result of a legislative domination of the Federal Election Commission—condemned by the Supreme Court in *Buckley v. Valeo, supra,* as subversive of the constitutional scheme of checks and balances—would have been achieved, at least in part, by indirection. The language of the statute plainly does not compel such a result—indeed it is at odds with it—and the Constitution reinforces the conclusion to be drawn from the words of the law.

### · VIII

The Court concludes that the President validly exercised his constitutional powers in appointing John McGarry to the Federal Election Commission, and accordingly an order will be entered denying plaintiff's motion for summary judgment and granting defendants' motion for summary judgment.

---

**40.** While plaintiff insists that the President has no authority to remove a member of an independent regulatory commission (Memorandum, pp. 27–32), the fact is that the President has not sought to remove plaintiff; his statutory term expired by operation of law and by the expiration of the commission announcing his original appointment, on April 30, 1977.

**41.** A President could probably not consistently with the principle of checks and balances grant a recess appointment to one rejected for the particular position by a vote of the Senate.