**Slip-Op. 02-100**

# UNITED STATES COURT OF INTERNATIONAL TRADE

**BEFORE:  RICHARD K. EATON, JUDGE**

| | |
|---|---|
| **NIPPON STEEL CORP., KAWASAKI STEEL CORP., THYSSENKRUPP ACCIAI SPECIALI TERNI Sp.A and ACCIAI SPECIALI TERNI (USA), INC.,** : | |
| Plaintiffs, : | |
| v. : | **Consol. Court No. 01-00103** |
| **UNITED STATES INTERNATIONAL TRADE COMMISSION** : | |
| Defendant, : | |
| and : | |
| **ALLEGHENY LUDLUM CORP., AK STEEL CORP., BUTLER ARMCO INDEPENDENT UNION, ZANESVILLE ARMCO INDEPENDENT UNION, and UNITED STEELWORKERS OF AMERICA, AFL-CIO/CLC,** : | |
| Defendant-Intervenors. : | |

[Plaintiffs' motion for summary judgment as to Counts One and Two of the complaints denied; ITC's cross-motion for summary judgment as to Counts One and Two of the complaints granted.]

Dated:  August 30, 2002

Gibson, Dunn & Crutcher, LLP (Joseph H. Price, Douglas R. Cox, Gracia M. Berg, Gregory C. Gerdes), for Plaintiff Nippon Steel Corporation.

Arent Fox Kintner Plotkin & Kahn, PLLC (Robert H. Huey, Matthew J. Clark, Nancy A. Noonan, Steven F. Hill, Timothy D. Osterhaus), for Plaintiff Kawaski Steel Corporation.

Hogan & Hartson, LLP (Lewis E. Leibowitz, Steven J. Routh, David G. Leitch, T. Clark Weymouth, David P. Kassebaum), for Plaintiffs ThyssenKrupp Acciai Speciali Terni Sp.A. and Acciai Speciali Terni (USA), Inc.

Lyn M. Schlitt, General Counsel, United States International Trade Commission; James M. Lyons, Deputy General Counsel, United States International Trade Commission (Gracemary Rizzo Roth-Roffy, Mark B. Rees), for the ITC.

Collier Shannon Scott, PLLC (Kathleen W. Cannon, Michael J. Coursey, Eric R. McClafferty, John M. Herrmann, Grace W. Kim, David A. Hartquist, R. Alan Luberda), for Defendant-Interveners Allegheny Ludlum Corporation, AK Steel Corporation, Butler Armco Independent Union, Zanesville Armco Independent Union, and the United Steelworkers of America, AFL-CIO/CLC.

## OPINION AND ORDER

EATON, Judge: This matter is before the court on cross-motions for summary judgment pursuant to USCIT R. 56, as to Counts One and Two[1] of the complaints filed by Nippon Steel Corporation ("Nippon"), Kawasaki Steel Corporation, ThyssenKrupp Acciai Speciali Terni Sp.A and Acciai Speciali Terni (USA), Inc. (collectively "Plaintiffs"). On December 28, 2001, this

---

[1]  Each Plaintiff filed a complaint in this consolidated action. While Counts One and Two of each complaint take issue with the manner of Dennis M. Devaney's appointment as a commissioner of the United States International Trade Commission with respect to: (1) the validity of the recess appointment; and (2) the existence of a vacancy, they do not do so in the same order. For purposes of this opinion, the court follows the order of the Nippon complaint. In Count One, Plaintiffs assert that the actions by which Mr. Devaney assumed office were not lawfully completed during a Senate recess and, therefore, "[b]ecause Dennis Devaney's alleged appointment to the ITC was invalid, his vote [on the final results was] invalid." (Compl. at ¶ 18.) Plaintiffs further allege that "[a]s a result of Dennis Devaney's invalid vote and determination, the Commission's determination . . . was not in accordance with law." (Id. at ¶ 19.) In like manner, Plaintiffs' Count Two alleges that, because no vacancy existed at the time Mr. Devaney assumed office, Mr. Devaney was not lawfully appointed and, thus, ineligible to vote on the Commission's determination leading to the final results. (Compl. at ¶¶ 25, 26.) Because of these alleged irregularities, Plaintiffs ask the court to "[d]eclare unlawful Dennis Devaney's vote and determination with regard to the [final results]" and "[d]eclare that the ITC shall instruct the U.S. Department of Commerce to revoke the antidumping order[s] . . . ." (Compl. at 10, 11.)

court granted discovery with respect to the matters at issue in Counts One and Two by its opinion in Nippon Steel Corporation v. United States International Trade Commission, Slip Op. 01-153, 25 CIT __ (Dec. 28, 2001), familiarity with which is presumed.

The court has jurisdiction over this matter pursuant to 28 U.S.C. § 1581(c) (2000) and 19 U.S.C. § 1516a(a)(2)(A)(i)(I) (2000).[2] Where a party challenges the findings of an antidumping review the court will hold unlawful "any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law . . . ." 19 U.S.C. § 1516a(b)(1)(B)(i). Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." USCIT R. 56(c); see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986). Here, there being no "genuine issue as to any material fact," summary judgment is appropriate. Oral argument was heard on August 14, 2002. For the reasons set forth below, the court finds that Dennis M. Devaney was validly appointed a commissioner of the United States International Trade Commission ("ITC") and that his vote with respect to the final results was lawfully cast, and grants summary judgment as to Counts One and Two in favor of the ITC.

---

[2]     This court held that "as the question of who is entitled to cast a vote on an [International Trade Commission] final determination is surely a question of procedure, it is surely within the competence of this court to hear such question. Thus, the court finds that it has jurisdiction, within the context of an affirmative finding of injury in a five-year sunset review, to hear procedural questions relating thereto, including the claims found in Counts One and Two of Plaintiffs' complaints." Nippon, Slip Op. 01-153 at 10–11, 25 CIT at __.

## BACKGROUND

By their complaints in this consolidated action, Plaintiffs challenge the ITC's affirmative material injury determination in the context of the five-year sunset review of imports of grain-oriented silicon electrical steel from Italy and Japan. See Grain-Oriented Silicon Elect. Steel from Italy and Japan, 66 Fed. Reg. 12,958 (Mar. 1, 2001); see also USITC Pub. No. 3396 (Feb. 2001) ("Final Results"). Counts One and Two of these complaints claim that the vote by which the Final Results were reached was not in accordance with law because Dennis M. Devaney, one of those voting, had not validly been appointed an ITC commissioner.

The facts with respect to Mr. Devaney's disputed appointment can be briefly stated. The term of ITC Commissioner Thelma Askey expired on December 16, 2000, and she continued to serve as a commissioner pursuant to the ITC's holdover provision, 19 U.S.C. § 1330(b)(2), until such time as her successor was "appointed and qualified."[3] The United States Senate, having commenced an intersession recess on December 15, 2000, reconvened at 12:01 p.m. on January 3, 2001. On January 2, 2001, Mr. Bob J. Nash, Assistant to the President and Director of Presidential Personnel for President William J. Clinton, prepared a memorandum ("Nash Memorandum") "in a form routinely used for such purposes"[4] by which he conveyed to the Executive Clerk's Office the "President's approval of Mr. Devaney's appointment" (Def.'s

---

[3] The holdover provision provides: "any commissioner may continue to serve as a commissioner after an expiration of his [statutory] term of office until his successor is appointed and qualified." 19 U.S.C. § 1330(b)(2).

[4] This memorandum is designated as being "For the President" "Via the Executive Clerk" and refers to documents for the President's signature. (See Nash Decl. Attach.) At oral argument counsel for the ITC could not confirm that there were, in fact, documents attached.

Mem., Ex. 4 ("Nash Decl.") at ¶ 4) pursuant to the "Recess Appointments Clause" of the

Constitution[5] as a commissioner of the ITC. While Mr. Nash states that he "cannot recall . . .

whether the President conveyed his approval of the appointment directly to me orally or in

writing" he does state that he "would not have prepared this memorandum had Mr. Devaney's

recess appointment to the ITC not received the President's consideration and had I not been

certain of the President's personal approval of the appointment."[6] (Id.) The Nash Memorandum

was received by the Executive Clerk's Office between 10:00 a.m. and 11:00 a.m. on January 3,

2001, and during the course of its processing, various White House personnel affixed their

initials to it, together with the time of day either manually or by stamp. Based on the

authorization provided by the Nash Memorandum, a "Recess Appointment Order"[7] "in a form

---

[5]     The Recess Appointments Clause reads: "The President shall have Power to fill up all Vacancies that may happen during the Recess of the Senate, by granting Commissions which shall expire at the End of their next Session." U.S. Const. art. II, § 2, cl. 3.

[6]     On this point Mr. Nash also states:

> The President's personal approval was required of all presidential appointments and my office would implement the President's decision. I never approved the preparation of an appointment document for a particular appointee unless I had previously ascertained that the President had personally approved the appointment. I would receive such approval directly from the President or, in rare instances (which did not occur here), through the Chief of Staff when the Chief of Staff was specifically instructed by the President to inform me of the President's approval of the appointment.

(Nash Decl. at ¶ 2.)

[7]     The "Recess Appointment Order" reads as follows:

> I hereby appoint Dennis M. Devaney, of Michigan, to be a member of the United States International Trade Commission for a term

routinely used by then President Clinton to make recess appointments" was prepared, and President Clinton's autopenned signature was affixed thereto. (Def.'s Resp. to Pls.' Third Set of Req. for Admis., Interrogs., and Prod. of Docs. at 4–5; see Pls.' Mem. Supp. Mot. Summ. J. ("Pls.' Mem.") App., Ex. 5 at 4–5.) All of this was completed prior to the Senate reconvening at 12:01 p.m. on January 3, 2001. The United States Senate commenced an intrasession recess on January 8, 2001, and reconvened on January 20, 2001. Ms. Askey participated in ITC business until at least January 12, 2001, and received the salary and other perquisites of an ITC commissioner until January 16, 2001. Mr. Devaney took the oath of office on January 16, 2001. On January 18, 2001, President Clinton signed Mr. Devaney's formal commission[8] which was dated January 3, 2001. Mr. Devaney cast his vote with respect to the Final Results at a meeting of the commissioners of the ITC on February 23, 2001.

By its Final Results, the ITC sustained the existing antidumping duty orders on grain-oriented electrical silicon steel from Italy and Japan by finding that "revocation of the[se] antidumping duty orders . . . would be likely to lead to continuation or recurrence of material

---

expiring December 16, 2009, until the end of the next session of the Senate of the United States and no longer, subject to the conditions prescribed by law.

s/William J. Clinton
THE WHITE HOUSE
January 3, 2001

[8]     For purposes of this opinion, "formal commission" means a commission meeting the requirements of 5 U.S.C. § 2902(a) (2000) which states: "the Secretary of State shall make out and record, and affix the seal of the United States to, the commission of an officer appointed by the President. The seal of the United States may not be affixed to the commission before the commission has been signed by the President."

injury to an industry in the United States . . . ." See Final Results at 1. The ITC reached this finding by a three-to-three—i.e., evenly divided—vote and, thus, the antidumping duty orders remained in effect pursuant to 19 U.S.C. § 1677(11) (2000).[9] The three persons voting in the affirmative were Mr. Stephen Koplan, Ms. Marcia Miller and Mr. Dennis M. Devaney.

With respect to Mr. Devaney's assumption of office and subsequent vote, Plaintiffs claim:

> Mr. Devaney's purported recess appointment to the ITC on January 3, 2001 was invalid because (a) there was not a "vacancy" on the ITC to which he lawfully could have been appointed, and (b) the President did not sign the commission appointing Mr. Devaney to office during the recess of the Senate that ended on January 3, 2001. In light of this invalid appointment, Plaintiffs respectfully request that this Court find that Mr. Devaney's vote in the [Final Results] was ultra vires and, accordingly, direct that the subject orders be revoked pursuant to the three-to-two vote of lawful ITC commissioners in favor of a negative determination.

(Pls.' Mem. at 1–2 (citation omitted); see also Nippon Compl. Count One at ¶¶ 18, 19; Count Two at ¶¶ 27, 28.)

The ITC disputes Plaintiffs' claims and asserts that Mr. Devaney was validly appointed:

> On the morning of January 3, 2001, before the end of the intersession recess that preceded the 107th Congress, former President Clinton appointed Dennis M. Devaney to the International Trade Commission ("ITC" or "Commission"), replacing Thelma Askey. Ms. Askey had been serving on the

---

[9] This subsection provides: "If the Commissioners voting on a determination . . . are evenly divided as to whether the determination should be affirmative or negative, the Commission shall be deemed to have made an affirmative determination." 19 U.S.C. § 1677(11).

Commission in a "holdover" capacity since the expiration of her statutory term of office in December 2000. Commissioner Devaney's recess appointment was perfected by a recess appointment order, which was routinely used to make recess appointments, and executed prior to the end of the above-mentioned recess.

(Def.'s Mem. Supp. Cross-Mot. Summ. J. ("Def.'s Mem.") at 1.)

## DISCUSSION

### A.     Mr. Devaney Was Validly Appointed

#### 1.     The Distinction Between an Appointment and a Commission

The court first turns to the question of whether Mr. Devaney was lawfully appointed pursuant to the Recess Appointments Clause. On this issue, Plaintiffs' primary argument is that a recess appointment requires the president to sign a commission to make it complete. Thus, Plaintiffs argue that, since Mr. Devaney's formal commission was not signed prior to 12:01 p.m. on January 3, 2001, his appointment was not completed during a recess of the Senate and thus he was not validly appointed.

At the outset it is worth noting that, although Article II, Section 2, Clause 3 of the Constitution is commonly called the Recess Appointments Clause, the word "appointment" is not found in the text of the clause itself. Rather, the President is empowered "during the Recess of the Senate" to "fill up all Vacancies . . . by granting Commissions." As there is no reason to assume that "filling up Vacancies" constitutes anything other than the presidential act of appointment, however, the court will refer to it as such hereafter. See The Federalist No. 67

(Alexander Hamilton) (The Recess Appointments Clause authorizes the President to make "temporary appointments.").

In order to determine whether President Clinton properly exercised his authority with respect to Mr. Devaney, <u>Marbury v. Madison</u>, 5 U.S. 137 (1803), is instructive. While important for other reasons,[10] this case was a dispute over the appointment, with the advice and consent of the Senate, of a justice of the peace for the "county of Washington." <u>Id</u>. at 155. As such, it involved the exercise of a president's power of appointment under the "Appointments Clause," Article II, Section 2, Clause 2 of the Constitution.[11] While the particular matter at issue was the delivery of Mr. Marbury's commission, Justice Marshall examined matters relating to the appointment that are pertinent to the case at bar.

Throughout his opinion, Justice Marshall makes explicit the distinction between the presidential act of appointment, and the granting of a commission. <u>See</u> <u>Marbury</u>, 5 U.S. at 156 ("The acts of appointing to office, and commissioning the person appointed, can scarcely be considered as one in the same . . . ."). As such, the appointment and the commission serve functions independent of one another: the appointment being the act of conferring the office; and

---

[10] Justice Marshall ultimately found that the Supreme Court did not have jurisdiction to hear the case, thus establishing the doctrine of judicial review. Hence, his discussion of the appointment itself might be described as dicta. Numerous courts having relied on its reasoning, however, the court is confident in using the opinion as persuasive precedent.

[11] The Appointments Clause reads: "and he shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States . . . ." U.S. Const. art. II, § 2, cl. 2.

the commission being evidence of the appointment. Thus, the act of appointment by the president is "a voluntary act," id. at 155, that demonstrates the president's will to appoint. The commission, on the other hand, serves as conclusive evidence of the exercise of that presidential will. See id. at 157 (indicating that even when the appointment and the commission are, in practice, indistinguishable, "still, the commission is not necessarily the appointment; though conclusive evidence of it."). This distinction has been followed in other cases. See Kilburn v. United States, 15 Ct. Cl. 41, 47 (1879) (citing Marbury and stating "The acts of appointing to office and commissioning the person appointed are two separate and distinct acts . . . ."); O'Shea v. United States, 28 Ct. Cl. 392, 401 (1893) ("The commission, whatever its form, is but evidence of the fact that the President has exercised his constitutional power of appointment . . . .").

### 2.      The Presidential Act of Appointment

What constitutes an act of appointment sufficient to create rights to an office is an "open and unequivocal act" on the part of an appointing authority. Bennett v. United States, 19 Ct. Cl. 379, 385 (1884) (citing Marbury, 5 U.S. at 385); see Horner v. Acosta, 803 F.2d 687, 694 (Fed. Cir. 1986); see also Nat'l Treasury Employees Union v. Reagan, 663 F.2d 239, 244–46 (D.C. Cir. 1981) (holding that notification sent to plaintiffs of their selection to federal jobs was an unconditional appointment, even though the required appointment forms had not yet been completed). The requirement of an open and unequivocal act may be met through various means. See Watts v. Office of Pers. Mgmt., 814 F.2d 1576, 1580 (Fed. Cir. 1987) (recognizing regular appointing procedures "do not necessarily exclude other rituals that may be devised to

signalize an appointment . . . ."). Here, the essence of Mr. Nash's declaration is that President Clinton performed the necessary open and unequivocal act by communicating directly to Mr. Nash that he, i.e., President Clinton, had "personally approved" (Nash Decl. at ¶ 2) the appointment of Mr. Devaney. In addition, the other activities that occurred prior to the Senate reconvening on January 3, 2001, including the various notations on the Nash Memorandum and the autopenned signing of the Recess Appointment Order, demonstrate that the President performed the "open and unequivocal act" necessary for an appointment.

### 3.     The Commission as Evidence of the Appointment

Next, the question arises as to the role of the commission. Plaintiffs urge that the execution of the commission is part of an appointment process and is "the last act that must be completed to vest an individual with a right to office . . . ." (Pls.' Mem. at 22 (citing 12 Op. Att'y Gen. 304, 306 (1867); Dep't of Justice, Off. Legal Counsel Mem. for Fred F. Fielding, Counsel to the President, of March 22, 1984).) Plaintiffs point to the language of the Recess Appointments Clause that a president may "fill up Vacancies . . . by granting Commissions" as proof that the granting of the commission is a necessary part of an act of appointment.

This contention, however, is at odds with Justice Marshall's conclusion that an appointment and a commission "can scarcely be considered as one and the same," Marbury, 5 U.S. at 156, and that the commission, while evidence of the appointment, is not necessarily the appointment itself. As such, it would appear that the Framers used the words "by granting Commissions," not to make the act of appointment and the signing of the commission a single

deed, but: (1) to distinguish appointments made under the Appointments Clause from those made pursuant to the Recess Appointments Clause; and (2) to provide for the temporary nature of these recess appointments. First, in order to put the distinction between the two appointments clauses into relief, the Framers put the power of granting commissions (the receipt of which, in the ordinary course, would be the right of any "Officer of the United States," in any event, see Article II, Section 3 of the Constitution,[12]) solely in the hands of the president. The Federalist No. 67 (Alexander Hamilton) ("The relation in which that clause stands to the other, which declares the general mode of appointing officers of the United States, denotes it to be nothing more than a supplement to the other, for the purpose of establishing an auxiliary method of appointment, in cases to which the general method was inadequate."). While the Senate is in session the president normally does appoint by means of signing the commission. This is because such appointment comes at the end of a process: nomination; confirmation; and appointment. During a recess, however, there is no equivalent process, merely the sole act of appointment by the President. See id. ("[T]he succeeding clause is evidently intended to authorize the President, SINGLY, to make temporary appointments . . . ."). Thus, the provision allowing the president to "fill up Vacancies . . . by granting Commissions" does not add a requirement that a commission be granted to make an appointment complete. Rather, it makes clear that the president may act alone in making these appointments, without relying on any other person or body to perform a necessary preliminary act. Second, the phrase "by granting Commissions," must be read together with the words that follow them, making the entire phrase

---

[12] Article II, Section 3 of the Constitution states that the President "shall Commission all the Officers of the United States."

"by granting Commissions which shall expire at the End of their [the Senate's] next Session."

By using these words the Framers limited recess appointments to a fixed term ending with the

closure of the next Senate session. The Federalist No. 67 (Alexander Hamilton) ("The time

within which the power is to operate . . . 'to the end of the next session' of that body, conspire to

elucidate the sense of the provision . . . ."). Thus, while commissions evidencing appointments

made pursuant to the Appointments Clause may demonstrate entitlements to office of varying

duration, those made pursuant to the Recess Appointments Clause cannot extend beyond the

Senate's next session. Id. ("[T]he succeeding clause is evidently intended to authorize the

President . . . to make temporary appointments."). Therefore, the court finds that the granting of

a commission is not necessary to complete a presidential act of appointment made pursuant to the

Recess Appointments Clause and, thus, Mr. Devaney's recess appointment did not require a

commission to make it complete.

### 4. Means Other Than a Commission May Show That the President's Power With Respect to Conferring Office is at an End

Finding that the commission is not the appointment itself, but rather, evidence of it does

not end the inquiry, however, for as evidence of an appointment the commission serves two

purposes. First, it proves an official's right to office and to the powers and duties the office

affords. Second, and this is particularly noteworthy with respect to officials not removable at

will, it demonstrates that the president's authority with respect to the office is at an end. See

Marbury, 5 U.S. at 157 ("Some point of time must be taken when the power of the executive over

an officer, not removable at his will, must cease. That point of time must be . . . the signature of

the commission.").[13] In keeping with the distinction between the appointment and the commission, though, Justice Marshall recognized that a commission is not the sole means of proving an appointment. Id. at 156 ("[I]f an appointment was to be evidenced by any public act, other than the commission, the performance of such public act would create the officer; and if he was not removable at the will of the President, would either give him a right to his commission, or enable him to perform the duties without it." (emphasis added)); see also Bennett, 19 Ct. Cl. at 385. Where, as with a commissioner of the ITC, the president may not remove an office holder at will, there must be some point at which the office is placed beyond the president's power. Here, there is ample evidence of public acts sufficient to put Mr. Devaney's appointment as an ITC commissioner beyond the authority of the president to remove him. First, and most significant, is the Recess Appointment Order which unequivocally states: "I hereby appoint Dennis M. Devaney . . . to be a Member of the United States International Trade Commission," and bears the authorized autopenned signature of the president.[14] In addition, the various

---

[13]    Plaintiffs also contend that, although Mr. Devaney's formal commission was signed on January 18, 2001, this writing would not serve as an appointment pursuant to the Recess Appointments Clause, because the Senate was not then in recess and because the document was "backdated" to January 3, 2001. However, were the court to accept Plaintiffs' argument that a formal commission is necessary to complete an appointment, Mr. Devaney would still validly be appointed as his formal commission was signed on January 18, 2001, during a Senate recess. The court is aware that the making of appointments during an intrasession recess is not without controversy. The long history of the practice (since at least 1867) without serious objection by the Senate, however, demonstrates the legitimacy of these appointments. See generally Michael A. Carrier, When is the Senate in Recess for Purposes of the Recess Appointments Clause?, 92 Mich. L. Rev. 2204 (1994). In addition, the date inscribed on the commission would not change its effective date from its date of execution, i.e., January 18, 2001. See also Bennett, 19 Ct. Cl. at 386.

[14]    Had the court found that a commission is needed to complete an appointment, the Recess Appointment Order would suffice. The Constitution does not prescribe any form for a commission, nor does it require that a commission have a manual signature. Thus, the

notations made by White House personnel demonstrate that the act of appointment was revealed to others. These things having been done while the Senate was still in recess, the office was put beyond President Clinton's power to rescind Mr. Devaney's appointment. As a result, sufficient open and unequivocal acts were performed to give Mr. Devaney "a right to his commission, or enable him to perform his duties without it." Marbury, 5 U.S. at 156.

### B.      Mr. Devaney's Appointment Filled a Vacancy

#### 1.      Under the ITC's Holdover Provision, the Vacancy and the Filling of the Vacancy Occur Simultaneously

Plaintiffs' next argument is that since Ms. Askey continued in office as a holdover, no vacancy existed to which Mr. Devaney could be appointed. (Pls.' Mem. at 5 ("On the date of Mr. Devaney's purported recess appointment, all six of the positions provided by law for ITC commissioners were occupied by incumbents. Although the fixed term of office of one of those incumbents had previously expired, that commissioner continued to hold her office pursuant to a statute that was specifically enacted to prevent the creation of vacancies upon the expiration of ITC commissioners' terms of office.").) Plaintiffs, however, read too little into the ITC's holdover statute. Rather than providing that the presence of a holdover commissioner eliminates the possibility of a successor assuming the holdover's place, the statute specifically provides for the end of the holdover's service upon a successor being "appointed and qualified." The statute,

---

autopenned signature on the Recess Appointment Order would appear to satisfy any requirement for the "granting of a Commission." Plaintiffs object that the recess appointment order does not fulfill the requirements of 5 U.S.C. § 2902. There is, however, no reason why the Recess Appointment Order could not fulfill the constitutional requirement of a "Commission" and another writing fulfill the requirements of 5 U.S.C. § 2902.

then, both provides for the continuance in office of a commissioner, and for the termination of

that officer's service upon a new commissioner taking office. Thus, Plaintiffs' assertion that no

vacancy existed for Mr. Devaney to fill is refuted by the plain language of the holdover statute.

The court having found that President Clinton completed the presidential act of appointment

during a Senate recess, a vacancy was created and simultaneously filled with the completion of

that act.[15] As such, Ms. Askey's continuance in service ended and a vacancy on the ITC was

---

[15]    This holding is at odds with that found in Staebler v. Carter, 464 F. Supp. 585 (D.D.C. 1979). The court in Staebler found that a vacancy occurs on the expiration of an officeholder's term:

> to the extent that "vacancy" is defined in the statute, it is defined as occurring at the conclusion of the statutory six-year term of office, rather than as coming about by the termination of a . . . holdover entitlement.
>
> Clause (a)(2)(C), while not directly defining the term "vacancy," comes close to doing so. That clause mandates that a "vacancy occurring other than by expiration of a term of office" shall be filled only for the remainder of the unexpired term. The plain implication of that language is that a vacancy does indeed occur as a result of and contemporaneously with the expiration of the term of office—not some subsequent time. . . .

Id. 589–590. Here, the ITC holdover provision contains language similar to that the Staebler court found persuasive. Subsection 1330(b), provides for staggered nine-year terms for the six commissioners. See 19 U.S.C. § 1330(b)(1). The statute further provides that: "any commissioner appointed to fill a vacancy occurring prior to the expiration of the term for which his predecessor was appointed shall be appointed for the remainder of such term. . . ." 19 U.S.C. § 1330(B)(1). Under the reasoning in Staebler, this language indicates that a vacancy occurs at the end of a term. While this court generally agrees with the analysis found in Staebler, it parts company with that court in its conclusion that "a vacancy does indeed occur as a result of and contemporaneously with the expiration of office—not some subsequent time . . . ." Staebler, 464 F. Supp. at 590. Although another theory may not be needed here, since the result with respect to Mr. Devaney would remain the same, it seems to the court that the plain meaning of the words "any commissioner may continue to serve as a commissioner after an expiration of his [statutory] term until his successor is appointed and qualified," 19 U.S.C. § 1330(b)(2), is that the vacancy occurs simultaneously with the appointment and qualification of a successor.

created concurrently with Mr. Devaney's appointment.

### 2.        The Requirement That an ITC Commissioner be "Qualified"

Plaintiffs further contend that Mr. Devaney could not replace Ms. Askey during a Senate

recess because of the statutory language allowing her to hold over until a successor was

"appointed and qualified."  Under Plaintiffs' theory, Ms. Askey remained in office throughout

the intersession recess because Mr. Devaney could only be "qualified" by Senate confirmation.[16]

In support of this contention Plaintiffs rely on Mackie v. Clinton, 827 F. Supp. 56 (D.D.C. 1993),

where, pursuant to 39 U.S.C. § 202(b), a member of the Board of Governors of the United States

Postal Service was continued in office after expiration of his term for a period not to exceed one

year or until his "successor has qualified."  Id. at 57.  In Mackie the court found that the

purported successor was not entitled to office because he was not confirmed by the Senate and

had thus not "qualified."  Id. at 57–58 ("It seems plain from the express language of the statute

that Governor Nevin holds and occupies the office of Governor through December 8, 1993,

unless he dies, resigns, is lawfully removed or some 'successor has qualified,' i.e., has been

nominated by the President and confirmed by the Senate.").  The Mackie court provided no

---

[16]        Plaintiffs also insist that because Ms. Askey continued to perform the duties of an ITC commissioner until at least January 12, 2001, and received the salary and the other perquisites of office until January 16, 2001, no vacancy existed on January 3, 2001, to which Mr. Devaney could be appointed.  Without in any way passing on the legitimacy or illegitimacy of their behavior, the court finds that (absent a resignation by Ms. Askey) neither Ms. Askey nor the ITC had the authority to determine the term of office of any commissioner, or determine when a vacancy existed.  This being the case, the matters cited by Plaintiffs are irrelevant to the question of whether a vacancy existed to which Mr. Devaney could be lawfully appointed within the meaning of the Constitution and relevant statutes.  It is to these that the court must look to determine if he was lawfully serving as an ITC commissioner on February 23, 2001, when the vote on the Final Results was taken.

analysis, reason, or citation for its conclusion that "qualified" meant "confirmed." In like

manner, Plaintiffs also rely on <u>Wilkinson v. Legal Services Corporation</u>, 865 F. Supp. 891

(D.D.C. 1994), <u>rev'd and remanded on other grounds</u>, 80 F.3d 535 (D.C. Cir. 1996), <u>cert.</u> <u>denied</u>,

519 U.S. 927 (1996), where that court found a recess appointment to the Board of the Legal

Services Corporation to be invalid. <u>See id.</u> at 900 ("The plain meaning of this language is that

each member of the Board remains as a Director after the person's term has expired until the new

Director has been 'appointed' by the President and 'qualified,' i.e., confirmed by the Senate.").

As in <u>Mackie</u>, the <u>Wilkinson</u> court at no point explains why the word "qualified" should be

found to mean "confirmed." While neither of these opinions make its reasoning explicit, it can

be presumed that these courts believed that only through the process of Senate confirmation

could the qualifications of a prospective officeholder be examined and found adequate.

On the express point of the meaning of the word "qualified," however, the court agrees

with the holding in <u>Swan v. Clinton</u>, 100 F.3d 973 (D.C. Cir. 1996), where the Court of Appeals

for the District of Columbia Circuit found that the word "qualified," in the context of a holdover

statute, allows for the filling of offices both by means of the Appointments Clause and the Recess

Appointments Clause.[17] <u>Id.</u> at 986 ("Rather, a more natural reading[[18]] of

---

[17]     The Circuit Court goes to some lengths to point out that the statute being construed had been amended in 1978, and the phrase "successor has been appointed and qualified" was changed to read "successor has been qualified." <u>See Swan</u>, 100 F.3d at 986. As there is no legislative history or other reason to suppose that the change was intentional, it seems likely that the words "been appointed and" were inadvertently omitted. <u>See</u> House Rep. No., 95-1383 at 26, <u>reprinted in</u> 1978 U.S.C.C.A.N. 9260, 9298.

[18]     An even more natural reading of "qualified" would find that the word means that the appointee has fulfilled the requirements for assuming office by, for example: being a member

of the bar, attaining a certain age, or having passed an exam or taking the oath of office. An examination of dictionary sources tends to support this as the natural reading, e.g.: "To make oneself competent <u>for</u> something, or capable of holding some office, exercising some function, etc., <u>by</u> fulfilling some necessary condition; <u>spec.</u> by taking an oath, and hence <u>U.S.</u>: To make oath, to swear <u>to</u> something (Bartlett, 1848). Also, to become eligible for an old-age pension." Oxford English Dictionary, <u>available at</u> http://dictionary.oed.com/cgi/entry/00194218 (last visited Aug. 30, 2002); "<u>qualified</u> <u>adj.</u> 1. Possessing the necessary qualifications; capable or competent <a qualified medical examiner>. 2. Limited; restricted. . . ." <u>Black's Law Dictionary</u>, at 1254 (7th ed. 1999).

This view is further supported by usage of "qualified" in other legal contexts. <u>See</u>, <u>e.g.</u>, Office of Legal Counsel, United States Department of Justice, <u>Presidential Appointees—Resignation Subject to the Appointment and Qualification of a Successor</u>, 3 U.S. Op. Off. Legal Counsel 152, 155, 162 n.2 (1979), 1979 OLC Lexis 25, 1979 WL 16555 ("The terms of Chief Justice Warren's retirement, established in the correspondence between him and the President, are that the Chief Justice's retirement will take effect upon the qualification of his successor . . . . The term 'qualification' or 'qualifies' refers in this context to the taking of the two oaths prerequisite to holding Federal judicial office, (1) the oath to support the Constitution required by Article VI, Clause 3 of the Constitution of all officers of the United States, and (2) that required by 28 U.S.C. 453 of each Justice or judge before performing the duties of his office."). Indeed, 19 U.S.C. § 1330(a) sets out the qualifications for an ITC commissioner:

> The United States International Trade Commission . . . shall be composed of six commissioners who shall be appointed by the President, by and with the advice and consent of the Senate. No person shall be eligible for appointment as a commissioner unless he is a citizen of the United States, and, in the judgment of the President, is possessed of qualifications requisite for developing expert knowledge of international trade problems and efficiency in administering the duties and functions of the Commission. A person who has served as a commissioner for more than 5 years (excluding service as a commissioner before January 3, 1975) shall not be eligible for reappointment as a commissioner. Not more than three of the commissioners shall be members of the same political party, and in making appointments members of different political parties shall be appointed alternately as nearly as may be practicable.

While the history of the phrase "appointed and qualified" supports the conclusion in <u>Swan</u> that either the Senate (in the context of the Appointments Clause) or the president (in the context of the Recess Appointments Clause) must pass upon a prospective officeholder's qualifications, under this alternate interpretation Mr. Devaney would nevertheless still be qualified for office as

'qualified' on its own would have it mean that the requirements for assuming office have been fulfilled, <u>which could be either by nomination with Senate confirmation or by recess appointment</u>." (emphasis added)). Thus, under <u>Swan</u> either the Senate or, when appropriate, the president acting alone, can pass on the adequacy of a prospective officeholder's qualifications. Further evidence to support this view can be found in the statute that was the genesis of the phrase "appointed and qualified"—the Tenure of Office Act of 1867[19]:

> The give-and-take between early Presidents and Congresses reveals the historic tension between the legislature and the executive over the power to make recess appointments. . . .
>
> The tension ultimately spawned the Army Appropriation Act of 1863, which was reenacted as part of the Tenure of Office Act in 1867. The Tenure of Office Act entitled all civil government employees "to hold such office until a successor shall have been in like manner [by and with the advice and consent of the Senate] appointed and qualified."

<u>Wilkinson</u>, 865 F. Supp. at 897–98 (footnotes and citations omitted; bracketing in original) ("The Tenure of Office Act . . . was the precursor of numerous federal 'holdover' provisions. In fact, there may be as many as sixty such provisions in the current United States Code."). By enacting the Tenure of Office Act, Congress intended to prevent a president from appointing successor officials unless they were confirmed by the Senate. This intention is evidenced by the statute's

---

a result of his political party enrollment (<u>see</u> Nash Memorandum (containing hand written notation of "R" next to Mr. Devaney's name); Def.'s Mem. Ex. 5 (containing "R" designation next to Mr. Devaney's name)) and his having taken the oath of office on January 16, 2001. (<u>See</u> Def.'s Mem., Ex. 6 ("Appointment Affidavits").)

[19] The relevant portion of the Tenure of Office Act reads: "every person holding any civil office to which he has been appointed by and with the advice and consent of the Senate, and every person who shall hereafter be appointed to any such office, and shall become duly qualified to act therein, is, and shall be entitled to hold such office until a successor shall have been in like manner appointed and duly qualified." 14 stat. 430 (1867).

requirement that successor officeholders be "qualified" only by Senate confirmation. Myers v. United States, 272 U.S. 52, 166 (1926) ("But the chief legislation in support of the reconstruction policy of Congress was the Tenure of Office Act, . . . providing that all officers appointed by and with the consent of the Senate should hold their offices until their successors should have in like manner been appointed and qualified . . . ."). Had Congress intended the word "qualified" to refer to Senate confirmation only, the phrase "in like manner" would be surplusage. Moreover, by providing that a successor official be qualified "in like manner"—i.e., by Senate confirmation—Congress recognized the legitimacy of another Constitutional means of qualification (by the president through the Recess Appointments Clause) and sought explicitly to proscribe its use. In the case at bar, because the words "in like manner" or other words requiring Senate confirmation are absent, there is no reason to conclude that Congress sought to curtail the president's power to appoint ITC commissioners using the Recess Appointments Clause. Thus, it appears that the word "qualified," in the context of the ITC's holdover provision, means that the qualifications of prospective officeholders can be examined and found to be adequate either by the Senate pursuant to the Appointments Clause, or by the president in accordance with the Recess Appointments Clause.

This conclusion is an accord with both Staebler v. Carter, 464 F. Supp. 585 (D.D.C. 1979) and McCalpin v. Dana, Civil Action No. 82-542 (D.D.C. Oct. 5, 1982) (unpublished decision). In Staebler the court rejected the argument that Senate confirmation was required for seating a successor to a member of the Federal Election Commission. At issue was a statutory provision allowing a commission member to hold over until "his successor has taken office as a

member of the Commission" pursuant to 2 U.S.C. § 437c(a)(2)(B). Staebler, 464 F. Supp. at 588

("Plaintiff argues that these provisions entitle him to hold office as a member of the Commission

until a successor has been nominated and confirmed by the Senate . . . ."). The Staebler court

rejected the idea that the word "qualified" meant "confirmed" based, in part, on its examination

of legislative history. While the statute in Staebler was not identical to the one at issue here, the

analysis is largely the same.[20] First, the Staebler court found no evidence in legislative history, or

in the plain reading of the statute itself, that Congress intended to prevent the president from

filling vacancies by using the Recess Appointments Clause. Id. at 591 ("Moreover, there is no

basis either in the language of the statute or in its legislative history to support the conclusion that

Congress meant to rein in the President in such an unprecedented manner. In the absence of a

clearly-expressed legislative intent, the Court will not speculate that the Congress sought to

achieve a result which would be both unusual and probably beyond its constitutional power.").

As with the provisions examined in Staebler, the legislative history of the "appointed and

qualified" language found in the conference report dealing with ITC's holdover provision, makes

---

[20]     The court in Staebler dismissed the notion that the holdover clause it construed
was different from the standard "appointed and qualified" one at issue here:

> One might well conclude that, by omitting the usual language
> "until a successor is appointed and qualified," Congress
> contemplated the recess appointment problem and explicitly meant
> to authorize such appointments. But that, too, would be reading
> too much into Chairman Hays' statement. It appears to the Court
> that he, and the Congress generally intended by the inclusion of the
> holdover provision ultimately adopted to do no more nor less than
> to follow the customary law and practice with respect to holdovers
> and their successors.

Staebler, 464 F. Supp. at 592.

no reference to restricting the president's authority:

> The Committee's amendment would increase the probability that if there is a majority vote for injury, there would be a majority finding on a remedy. The Committee's amendment would: . . .
>
>> (5) Provide that a commissioner whose term has expired may continue in office until his successor has been nominated by the President and confirmed by the Senate . . . .
>
> In the past, there has often been a delay between the time of the expiration of a commissioner's term and the taking of office of his successor. Because any such periods of delay would leave the Commission without an odd number of commissioners and, therefore, without a tie-breaker, the Committee's amendment would continue in office the Commissioner whose term has expired until his successor is confirmed by the Senate and takes office.

S. Rep. No. 94-938, Pt. II, at 58–59 (1976) to accompany the Tax Reform Act of 1976, reprinted in 1976 U.S.C.C.A.N. 1, 4083–84. While the conference report uses the words "confirmed by the Senate" it does so in describing the normal course of events—what The Federalist No. 67 referred to as the "general mode." There is no indication that Congress intended to restrict use of the Recess Appointments Clause or, in fact, that Congress took the Recess Appointments Clause into account. Indeed, the entire import of the conference report's words is that the enactment of the holdover provision would help ensure an odd number of commissioners[21] so as to avoid tie votes. Without more, it is doubtful that Congress intended the result urged by Plaintiffs. See

---

[21] Because the mechanism for determining what constituted an appropriate remedy for injury to domestic industries was seen by some as not functioning as anticipated, Congress considered adding a seventh commissioner to the ITC in order that there would be a "tie-breaking" vote for remedy determinations. See S. Rep. No. 94-938, Pt. II, at 58, reprinted in 1976 U.S.C.C.A.N. at 4083. The proposed additional commissioner was not added, however, and an evenly-divided vote of commissioners is now "deemed" to be an "affirmative determination" pursuant to 19 U.S.C. § 1677(11).

Staebler, 464 F. Supp. at 592 ("The Court finds it difficult to believe that, had the Congress intended to take the significant step of attempting to curtail the President's constitutional recess appointment power, or even to legislate in the area of that power, it would [not] have considered the matter with more deliberation or failed to declare its purpose with greater directness and precision."). Indeed, the court in Staebler—as has this court—examined several instances where statutes had similar legislative histories to the statute at issue here, and found in none of them evidence that the Congress intended to restrict recess appointments by requiring Senate confirmation. Id. at 592–93 ("However, in none of these reports is there any indication that the Committees considered, much less that they intended to rule out, the constitutionally-prescribed recess appointment option. The thrust of all the comments is that continuity in office is important and that the disruption caused by prolonged vacancies should be avoided.").

Finally, the ITC cites the Staebler court for the proposition that added legitimacy is given recess appointments "by the fact that presidents have consistently construed holdover language as raising no bar to their recess appointment power." (Def.'s Mem. at 12);[22] see Staebler, 464 F. Supp. at 594 ("[T]he history of prior practice demonstrates primarily that various Presidents have

---

[22]     Many holdover statutes of regulatory agencies employ nearly identical language to that of the ITC's holdover provision found in 19 U.S.C. § 1330(b)(2). See Wilkinson, 865 F. Supp. at 898 (listing various holdover statutes of regulatory agencies: 5 U.S.C. § 1202(b) (Merit Systems Protection Board member "may continue to serve until a successor has been appointed and has qualified"); 16 U.S.C. § 792 (member of the Federal Power Commission "shall be appointed . . . until his successor is appointed and has qualified"); 49 U.S.C. § 10301 (Interstate Commerce Commission member "may continue to serve until a successor is appointed and qualified"); 15 U.S.C. § 41 (Federal Trade Commission member "upon the expiration of his term of office . . . shall continue to serve until his successor shall have been appointed and shall have qualified"); 15 U.S.C. § 78d(a) (member of the Securities and Exchange Commission "shall hold office . . . until his successor is appointed and has qualified")).

acted on the assumption that they have the power to make the appointments, and that the Congress did not challenge this Presidential practice, such as by failure subsequently to confirm the successor or by amendment of the relevant laws. . . .  [T]he lack of a challenge, either in the courts by someone with standing to complain, or by the Congress if it felt its prerogatives had been invaded, lends some, albeit not decisive, weight to defendants' ultimate position that McGarry's nomination is valid."); see also United States v. Midwest Oil Co., 236 U.S. 459, 473 (1915) ("[D]etermining the meaning of a statute or the existence of a power, weight shall be given to the usage itself—even when the validity of the practice is the subject of investigation."); McLaren v. Fleischer, 256 U.S. 477, 481 (1921) ("It therefore comes within the rule that the practical construction given to an act of Congress, fairly susceptible of different constructions, by those charged with the duty of executing it is entitled to great respect and, if acted upon for a number of years, will not be disturbed except for cogent reasons."); Stuart v. Laird, 5 U.S. 299 ("[I]t is sufficient to observe, that practice and acquiescence under [the act] for a period of several years . . . has indeed fixed the construction.  It is a contemporary interpretation of the most forcible nature.  This practical exposition is too strong and obstinate to be shaken or controlled.").  This being the case, the court agrees with the reasoning in Staebler that the long history of presidential appointments under the Recess Appointments Clause, without Congressional objection that these appointments violated holdover provisions, adds weight to the ITC's case.  Thus, the court holds that Dennis M. Devaney was "qualified" by the act of presidential appointment in compliance with the ITC's holdover provision, and thus filled a vacancy on the ITC within the meaning of the Recess Appointments Clause.

Therefore, the court finds that the appointment of Dennis M. Devaney as a commissioner of the ITC was valid, and that Mr. Devaney lawfully cast his vote with respect to the <u>Final Results</u>.


### CONCLUSION

For the reasons set forth above, the court denies Plaintiffs' Motion for Summary Judgment as to Counts One and Two of the complaints, and the court grants the ITC's Cross-Motion for Summary Judgment as to Counts One and Two of the complaints.


_____
Richard K. Eaton, Judge


Dated: August 30, 2002
      New York, New York